DT Lulana Gardens LLC v. SDCK I LLC, 2026 NCBC 43.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV016426-590

DT LULANA GARDENS LLC;
BOMA LC LLC; BOMA NORTH
CAROLINA, LLC; BMB
INVESTMENTS, LLC; and SNAKE
RIVER DEVELOPMENT, LLC,

Plaintiffs,

v.

SDCK I LLC; JASPER LAKE, LLP;
JASPER LAKE VENTURES TWO,
LLC; and SÉTANTA
DEVELOPMENT CAPITAL, LLC,

Defendants.

**ORDER AND OPINION ON MOTIONS
TO DISMISS**

**THIS MATTER** is before the Court on Defendant Sétanta Development Capital, LLC's ("Sétanta") Motion to Dismiss Amended Complaint (ECF No. 42) and Defendants SDCK I, LLC ("SDCK"), Jasper Lake, LLP ("Jasper Lake"), and Jasper Lake Ventures Two, LLC's ("Jasper Lake Two") Motion to Dismiss (ECF No. 44) (collectively, the "Motions to Dismiss" or the "Motions").

**THE COURT**, having considered the Motions, the briefs of the parties, the arguments of counsel, and all appropriate matters of record, **CONCLUDES** that the Motions should be **GRANTED in part** and **DENIED in part** for the reasons set forth below.

*James, McElroy & Diehl, P.A., by John R. Brickley; and Polsinelli, PC, by Hannah R. Esquenazi, Matthew R. Groseclose, and Amy E. Hatch, for Plaintiffs.*

*Katten Muchin Rosenman LLP, by Michaela Holcombe, Dylan Marriott, Lindsey L. Smith, and Ethan Trotz, for Defendants SDCK I, LLC, Jasper Lake, LLP, and Jasper Lake Ventures Two, LLC; and Womble Bond*

*Dickinson (US) LLP, by Sarah Motley Stone, for Defendant Sétanta Development Capital, LLC.*

Davis, Judge.

## INTRODUCTION

1.    This case involves a complex set of proposed and actual real estate transactions encompassing thousands of acres of land located in Hawaii. The plaintiffs and defendants had a business relationship (the legal definition of which is hotly disputed by the parties) that started off well but then soured. In this lawsuit, the plaintiffs seek to recover millions of dollars from the defendants on a variety of legal theories grounded in both contract and tort law. The defendants contend in the present Motions to Dismiss that none of the plaintiffs' claims are legally valid.

## FACTUAL AND PROCEDURAL BACKGROUND

2.    The Court does not make findings of fact in connection with a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and instead recites those facts contained in the complaint (and in documents attached to, referred to, or incorporated by reference in the complaint) that are relevant to the Court's determination of the motion. *See, e.g., Window World of Baton Rouge, LLC v. Window World, Inc.*, 2017 NCBC LEXIS 60, at *11 (N.C. Super. Ct. July 12, 2017).[1]

3.    Plaintiff DT Lulana Gardens, LLC ("DTLG") is a Delaware limited

---

[1] At the outset, the Court notes that throughout their Amended Complaint (ECF No. 19) Plaintiffs engage in "group pleading," meaning that they lump all Plaintiffs and all Defendants together without specifically enumerating which of the Plaintiffs are bringing a particular claim or which specific Defendant is responsible for committing the allegedly wrongful act giving rise to that claim. The Court takes this opportunity to express its strong disapproval of this practice, which makes its task in ruling on the present Motions more difficult than it would otherwise be.

liability company with its principal place of business in Castle Rock, Colorado. (Am. Compl. ¶ 2.)

4. Plaintiff BOMA LC LLC ("BOMA") is a Delaware limited liability company with its principal place of business in Castle Rock, Colorado. (Am. Compl. ¶ 3.)

5. Plaintiff BOMA North Carolina, LLC ("BOMA NC") is a North Carolina limited liability company with its principal place of business in Castle Rock, Colorado. (Am. Compl. ¶ 4.)

6. Plaintiff BMB Investments, LLC ("BMB") is a Delaware limited liability company with its principal place of business in Castle Rock, Colorado. (Am. Compl. ¶ 6.)

7. Plaintiff Snake River Development, LLC ("Snake River," and collectively with DTLG, BOMA, BOMA NC, and BMB, "Plaintiffs" or the "BMB Parties") is a Delaware limited liability company with its principal place of business in Castle Rock, Colorado. (Am. Compl. ¶ 5.)

8. Defendant SDCK is a Delaware limited liability company with its principal place of business in Charlotte, North Carolina. (Am. Compl. ¶ 7.)

9. Defendant Jasper Lake is a Delaware limited liability company with its principal place of business in Englewood Cliffs, New Jersey. (Am. Compl. ¶ 8.)

10. Defendant Jasper Lake Two is a Delaware limited liability company with its principal place of business in Englewood Cliffs, New Jersey. (Am. Compl. ¶ 9.)

11. Jasper Lake and Jasper Lake Two are controlled by an individual named Noah Kolatch and are referred to collectively herein as the "Kolatch Parties." (Am. Compl. ¶ 9.)[2]

12. Defendant Sétanta is a North Carolina limited liability company with its principal place of business in Charlotte, North Carolina. (Am. Compl. ¶ 10.)

13. For clarity, the relationship between Plaintiffs can be broadly stated as follows: BMB is the "ultimate parent company" of DTLG, BOMA, BOMA NC, and Snake River. (Am. Compl. ¶ 6.) DTLG is a special purpose entity that BMB created in order to enter into a Purchase and Sale Agreement ("PSA") with one of the named Defendants, SDCK, that is described in great detail throughout this Opinion. As is also thoroughly discussed below, BOMA entered into a pledge agreement with SDCK in which it pledged its 100% ownership interest in BOMA NC as collateral for DTLG's obligations under the PSA. Finally, Snake River is the entity that BMB utilizes for development projects. (Am. Compl. ¶¶ 15, 23, 26.)

14. Prior to 2022, the parties initially engaged in a North Carolina-based real estate development project (the "North Carolina Project"). (Am. Compl. ¶ 14.) In order to initiate the North Carolina Project, Sétanta sought, and obtained, funds from investors—including the Kolatch Parties—for purposes of a loan to the BMB Parties. (Am. Compl. ¶ 14.) Using that loan, the BMB Parties developed and sold land contained within the North Carolina Project and compensated all investors, including Sétanta. (Am. Compl. ¶ 14.)

---

[2] Although Noah Kolatch is referenced a number of times by Plaintiffs in the Amended Complaint, he is not a party to this action.

15. After completion of the North Carolina Project, on 16 February 2022, Sétanta proposed a new commercial real estate development project (the "Hawaii Project") to Snake River. (Am. Compl. ¶ 15.) The Hawaii Project included the "acquisition and development of four different parcels of land in Hawaii consisting of over 3,000 acres of real estate" (the "Hawaii Real Estate"). (Am. Compl. ¶ 15.)

16. At the request of Sétanta, BMB, Sétanta, and the Kolatch Parties initiated investment discussions around this time. (Am. Compl. ¶ 15.) Plaintiffs allege that those discussions resulted in "Sétanta, BMB, and Jasper Lake agree[ing] to collectively pursue the Hawaii Project and beg[inning] discussions to form a new joint venture investment to achieve their collective goals." (Am. Compl. ¶ 15.)

17. Plaintiffs allege that over the following three years

> Sétanta, BMB, and Jasper Lake worked as joint venture partners and, in furtherance of the Hawaii Project, both BMB and Jasper Lake (and their respective affiliates) enlisted investors, solicited funds, worked with stakeholders on the ground, hired and coordinated with vendors, liaised with the local water and transit authorities, and pooled time and resources to overcome any hurdles that posed problems to the project. BMB and Jasper Lake also jointly worked to garner political support for the endeavor, representing themselves as a partnership to two consecutive Mayors of the area governing the Hawaiian Real Estate.

(Am. Compl. ¶ 16.)

18. During this time, the parties encountered an obstacle to their plans. They discovered that one of the four parcels of the Hawaii Real Estate (the "Encumbered Parcel") was encumbered by two mortgages: "(1) a $10,000,000 loan related to prior seller financing (the 'Seller Financing Loan'), and (2) a $5,000,000 loan secured by a second mortgage in favor of an entity referred to as Iron Horse (the

'Iron Horse Loan')." (Am. Compl. ¶ 17.)

19.     As a solution, the Kolatch Parties first suggested using a $120 million credit facility to purchase all of the Hawaii Real Estate and subsequently satisfy all encumbrances on the Encumbered Parcel.  (Am. Compl. ¶ 17.)  In accordance with that idea, the Kolatch Parties and BMB considered using a BMB affiliate to develop and own the Hawaii Real Estate.  (Am. Compl. ¶ 17.)

20.     However, the parties abandoned that idea upon learning that the Encumbered Parcel was subject to a foreclosure auction (the "Iron Horse Auction") pursuant to the Iron Horse Loan.  (Am. Compl. ¶ 18.)  The Iron Horse Auction was scheduled to take place on 4 April 2022.  (Am. Compl. ¶ 18.)  Upon receiving this information, Plaintiffs allege, the parties realized that "[i]f the Iron Horse Auction occurred, the Encumbered Parcel, which was an integral parcel in the Hawaii Project, would be lost."  (Am. Compl. ¶ 18.)

21.     Thus, BMB, the Kolatch Parties, and Sétanta coordinated a plan to purchase the Iron Horse Loan and postpone the Iron Horse Auction.  (Am. Compl. ¶ 18.)

22.     Specifically, the Kolatch Parties and Sétanta

agreed to create and fund a new entity—SDCK—to purchase the Iron Horse Loan and then reset the Auction Date to July 30, 2022.  Upon completion of this purchase, SDCK would then sell the Iron Horse Loan to an affiliate of BMB with the intent that the BMB affiliate would complete the Iron Horse Auction and become the owner of the Encumbered Parcel.  This facilitated the parties' understanding and agreement that an affiliate of BMB would ultimately hold title to the Hawaii Real Estate in connection with the parties' larger plan to jointly develop the Hawaii Project.

(Am. Compl. ¶ 19.)

23.     The parties memorialized their broader plans for the Hawaii Project in a confidential (and non-binding) Letter of Intent ("LOI"), dated 1 April 2022, between the previous Hawaii Real Estate owners, BMB, Snake River, and Sétanta.  (Am. Compl. ¶ 20; *see also* Am. Compl. Ex. A, ECF No. 74.1.)

> The understanding of the parties to the Confidential LOI was that Sétanta would act as investor and finance up to $90,000,000 of the estimated $157,000,000 price tag for the Hawaii Project; SDCK (referred to as "Newco" in the Confidential LOI), managed by the Kolatch Parties, would be formed as a special purpose entity to facilitate the financial transactions supporting development of the Hawaii Project; BMB would obtain third-party financing for the balance of the project costs, guarantee the project's development, and potentially act as an owner of the real estate; and Snake River would act as developer managing day-to-day operations.
>
> The Confidential LOI provided for BMB, or its affiliate entity, to pool resources and share in the profits and losses of the Hawaii Project with Sétanta and SDCK, whether or not BMB financially contributed to the refinancing agreement articulated in the Confidential LOI. . . . Specifically, if BMB did not contribute financially to the refinancing transaction, SDCK would hold fee simple title to the real estate within the Hawaii Project, and BMB would receive a 15% interest in SDCK and its distributions in exchange for guaranteeing development and obtaining third-party financing.

(Am. Compl. ¶¶ 20–21.)

24.     During discussions of the plan to purchase the Iron Horse Loan and postpone the Iron Horse Auction, the parties allegedly understood that "no money would actually change hands."  (Am. Compl. ¶ 22.)  Instead, the purchase price that SDCK would receive from BMB for the Iron Horse Loan would be immediately returned to BMB for SDCK's equity in the Encumbered Parcel.  (Am. Compl. ¶ 22.)

25.     For the purpose of effectuating its purchase of the Iron Horse Loan from

SDCK, BMB created DTLG as a special purpose entity, and on 1 April 2022 DTLG entered into the PSA with SDCK. (Am. Compl. ¶ 23; *see also* Am. Compl. Ex. C, ECF No. 74.3.)

26. The PSA provided that DTLG would purchase the Iron Horse Loan for an amount equal to "the greater of (i) $8,014,667.00 or (ii) $7,781,229.79, plus an amount equal to eighteen percent (18%) per annum from the date [of the PSA] through and including the Closing Date (the 'Purchase Price')." (Am. Compl. Ex. C § 3; Am. Compl. ¶ 24.) The PSA set the Closing Date for 30 July 2022—the same day as the scheduled foreclosure auction of the Encumbered Parcel, which would enable SDCK to purchase the Iron Horse Loan, avoid the Iron Horse Auction, and then sell the Iron Horse Loan to DTLG at the same time. (Am. Compl. ¶ 24; *see also* Am. Compl. Ex. C. § 4.)

27. The PSA also contained the following merger clause:

> Complete Agreement. This Agreement constitutes the entire agreement and understanding between the parties hereto with respect to the proposed transaction. The parties acknowledge that they have had sufficient time to make all relevant investigations and inquiries. No representation, promise, inducement or statement of intention relating to the proposed transaction has been made by any party that is not set forth in this Agreement. All prior communications, negotiations, instruments and understandings, whether oral or written (including, without limitation, the LOI), shall be deemed merged in this Agreement.

(Am. Compl. Ex. C. § 38.)

28. On the same day that DTLG and SDCK executed the PSA, the Kolatch Parties—through Noah Kolatch—communicated via electronic mail to BMB, Snake River, and Sétanta that they would "use [their] best efforts to draft an agreement

that allow[ed] [them] to invest equity capital alongside BMB up to an aggregate amount equal to the Purchase Price" of the PSA. (Am. Compl. ¶ 25; *see also* Am. Compl. Ex. D, ECF No. 74.4.)

29. The Kolatch Parties sought additional security from BMB for the transaction contemplated by the PSA. For this reason, contemporaneously with the execution of the PSA, BOMA and SDCK entered into a Pledge and Security Agreement (the "Pledge Agreement"), dated 1 April 2022. (Am. Compl. ¶ 26; *see also* Am. Compl. Ex. E, ECF No. 74.5.) Under the Pledge Agreement, BOMA "pledge[d] [to SDCK] its 100% membership interest in BOMA NC (the 'Pledged Interests') as security for payment of the Purchase Price." (Am. Compl. ¶ 26.)

30. Plaintiffs allege that during this time period and thereafter

> all parties continued taking steps forward toward the joint venture and the acquisition of the Hawaii Real Estate and joint development of the Hawaii Project. For the BMB Parties, this involved engaging with contractors for construction, investigating permits, plans, and approvals, and numerous meetings in Hawaii with political figures to ensure there would be no obstacles to development. The Kolatch Parties and SDCK (which was created by the Kolatch Parties and controlled by them), in turn, were charged with ensuring clear title to the Hawaii Real Estate, and working to secure investors, buy out creditors, and ultimately take title to [the] Hawaii Real Estate.

(Am. Compl. ¶ 27.)

31. At some point, however, SDCK, "at the direction of the Kolatch Parties and as the owner of the Iron Horse Loan, chose to postpone the Auction Date indefinitely." (Am. Compl. ¶ 28.) This decision—made without the consent of Plaintiffs—"obliterated the purpose of the PSA[ ]" because "the Closing Date thereunder was intended to be contemporaneous with the Auction Date, so Plaintiffs

could take title to the Encumbered Property, and SDCK could acquire an equity interest up to the Purchase Price." (Am. Compl. ¶ 28.)

32. As a result, when the PSA's Closing Date—30 July 2022—came around, "neither SDCK nor any of the Kolatch Parties made a demand that DTLG deliver the Purchase Price, nor did they even mention the topic, because it was well understood that the closing under the PSA was contingent on the Iron Horse Auction being completed on the same day." (Am. Compl. ¶ 29.)

33. Plaintiffs allege that the parties continued joint development of the Hawaii Project by engaging with certain investors, vendors, and politicians. (Am. Compl. ¶ 29.)

> The joint venture was so concrete and solidified that, on occasions too numerous to count, Mr. Kolatch and Sétanta represented to third parties that Plaintiffs, and their principals, were in fact members of SDCK. This meant invoices and/or communications for SDCK were frequently addressed to principals of Snake River and BMB, and these principals were given authorization to sign and contract with third parties on behalf of SDCK. The parties even shared legal counsel as they worked towards completion of the foreclosure of the Encumbered Parcel and a broader purchase of the Hawaii Real Estate.

> In fact, agents of the BMB Parties together with Mr. Kolatch met with the Mayor of "the Big Island," where the Hawaii Project was located, on numerous occasions, and would represent that they were all one and the same entity, SDCK, working to acquire the Hawaii Real Estate, including the Encumbered Parcel.

(Am. Compl. ¶ 30.)

34. On 14 December 2023 (more than sixteen months after the PSA's stated Closing Date), SDCK's counsel sent a letter (the "Termination Notice") to DTLG stating in pertinent part as follows:

We represent [SDCK] in connection with the above-referenced PSA. As you know, Seller [sic] failed to close on the sale of [SDCK]'s right, title, and interest in and to the Loan Documents, which are defined and more particularly described in the PSA. Pursuant to the PSA, [DTLG] and [SDCK] agreed to close on the sale of the Loan Documents on or before June 30, 2022. Because the sale of the Loan Documents did not occur before the required date—and has never occurred—you are hereby notified of [DTLG]'s default.

Closing on the Sale was a condition precedent to [SDCK]'s obligations, and thus, following the Closing Date, [SDCK] was relieved of all obligations under the PSA. Let this letter serve as formal notice that [SDCK] does hereby terminate any and all rights of [DTLG] under the PSA.

Please direct any further inquiries regarding this matter to my attention. [SDCK] reserves all rights and remedies, including without limitation [SDCK]'s rights under Paragraph 37 of the PSA (["]Buyer's Default") and under that certain Pledge and Security Agreement dated April 1, 2022 by BOMA LC LLC in favor of [SDCK].

(Am. Compl. Ex. F, ECF No. 74.6; *see also* Am. Compl. ¶ 33.)

35. Plaintiffs allege that they "understood the Termination Notice not only as a reflection of the parties' mutual agreement to terminate the PSA, as the Auction Date did not happen as planned and the Closing Date had long expired, but also as an indication of the parties' collective intent to proceed with the joint venture, which they did in full force." (Am. Compl. ¶ 33.)

36. SDCK ultimately rescheduled the auction of the Encumbered Parcel to 17 January 2024. However, SDCK still did not demand at that time that DTLG purchase the Iron Horse Loan pursuant to the PSA. (Am. Compl. ¶ 34.) Instead, the parties agreed that SDCK "should acquire title to the Encumbered Parcel[ ]" and "[u]pon completion of the Iron Horse Auction, SDCK did just that." (Am. Compl. ¶ 34.)

37. In late 2024, the holder of the Seller Financing Loan foreclosed on its interest in the Encumbered Parcel—causing SDCK to lose its ownership interest in the Encumbered Parcel. (Am. Compl. ¶ 35.) Plaintiffs allege that this foreclosure "rendered the value of the Iron Horse Loan, which was once to be sold through the now-terminated PSA, worthless and represented a huge loss for the joint venture." (Am. Compl. ¶ 35.)

38. In an attempt to salvage the Hawaii Project despite this setback, the parties discussed during late 2024 and early 2025 the possibility of SDCK acquiring portions of the Hawaii Real Estate, including repurchasing the Encumbered Parcel. (Am. Compl. ¶ 36.) However, it ultimately became clear that the Hawaii Project was unlikely to succeed. (Am. Compl. ¶ 36.)

39. Plaintiffs allege that Noah Kolatch, who was "under pressure to recoup the Kolatch Parties' losses from the joint venture, the most notable being the cost to purchase the Iron Horse Loan, began a crusade to shift all losses to his business partners." (Am. Compl. ¶ 37.)

40. As a result, on 7 February 2025, SDCK sent two demand letters (collectively, the "Demand Letters")—one addressed to DTLG and BOMA and the other addressed to BOMA and BOMA NC. (Am. Compl. Ex. G, ECF No. 74.7; Am. Compl. ¶ 37.)[3] The Demand Letter to DTLG and BOMA stated in relevant part as follows:

[3] The first Demand Letter purported to be a **"NOTICE OF BREACH OF PURCHASE AGREEMENT,"** and the second stated that it was both a **"NOTICE OF BREACH OF PURCHASE AGREEMENT"** and a **"NOTICE OF EXERCISE OF SDCK RIGHTS UNDER BOMA PLEDGE**[.]**"**

This firm represents [SDCK] with respect to the above referenced Purchase Agreement and BOMA Pledge.[ ]  Pursuant to Section 4 of the Purchase Agreement, You, as [DTLG], were required to close on the purchase of the Loan Documents on July 30, 2022, (the "Closing Date"). [SDCK] was ready, willing and able to close the sale of the Loan Documents, but You failed to do so.  Your failure to close is a default under the Purchase Agreement.  As an indication of [SDCK's] damages, if [DTLG] were to perform, the "Purchase Price" pursuant to the Purchase Agreement would be $7,781,229.79, PLUS an amount equal to eighteen percent per annum through and including the closing date, therefore the amount owed, assuming a closing date of January 31, 2025 would be $12,447,294.91.

[DTLG]'s obligations under the Purchase Agreement are secured by [ ] the BOMA Pledge.  The BOMA Pledge pledges and grants [SDCK] a security interest in BOMA's membership interest in BOMA North Carolina, LLC ("BOMA NC").

This letter shall serve as formal notice of (i) the above referenced default and the damages suffered by [SDCK] as a result of said default, and (ii) [SDCK]'s intention to pursue any and all remedies available to it at law or in equity, including but not limited [to] its damages for [DTLG]'s breach of the Purchase Agreement, its costs and attorneys' fees pursuant to Section 17 of the Purchase Agreement, and foreclosure on its rights under the BOMA Pledge.  That said, [SDCK] prefers to resolve this matter without the necessity of litigation or foreclosure.  We are aware that you have been in communication with [SDCK]'s President, Noah Kolatch, and we encourage you to reach out to him in an effort to do so.

(Am. Compl. Ex. G, at 1–2.)

41. The following month, on 17 March 2025, SDCK sent BOMA, BOMA NC, BMB, and Sétanta a "Notice of Public Sale of Collateral Under North Carolina Uniform Commercial Code" (the "Notice of Sale").  (Am. Compl. ¶ 41; Am. Compl. Ex. H, ECF No. 74.8.)  The Notice of Sale announced SDCK's intent to sell the Pledged Interests (that is, BOMA's 100% ownership interests in BOMA NC) pursuant to its rights under the Pledge Agreement at a UCC foreclosure sale on 1 April 2025.  (Am.

Compl. ¶ 41; *see also* Am. Compl. Ex. H.)

42.     On 25 March 2025, DTLG, BOMA, and BOMA NC notified SDCK by letter that they disputed SDCK's right to foreclose on the Pledged Interests and intended to file a lawsuit to enjoin the foreclosure sale. (Compl., ECF No. 2, ¶ 34; *see also* Compl. Ex. F.)

43.     Three days later, DTLG, BOMA, and BOMA NC initiated the present lawsuit by filing a Complaint in Mecklenburg County Superior Court against SDCK. In their Complaint, Plaintiffs sought judicial action "to permanently enjoin [SDCK] from unfairly and unlawfully pursuing foreclosure of certain collateral owned by Plaintiff BOMA." (Compl. ¶ 1.) Plaintiffs additionally filed Motions for Temporary Restraining Order and Preliminary Injunction that same day. ("TRO Motion," ECF No. 3.)

44.     On 1 April 2025, the Honorable Matthew Osman issued an Order Denying Plaintiffs' Motion for Temporary Restraining Order (ECF No. 6).

45.     Shortly after their TRO Motion was denied, Plaintiffs negotiated a forbearance with SDCK that resulted in the foreclosure sale being postponed until 2 May 2025. (Am. Compl. ¶ 42.)

46.     Prior to the new date of the foreclosure sale, Plaintiffs requested from SDCK a payoff amount "with respect to the amounts SDCK alleged secured the purported obligations owed under the Pledge." (Am. Compl. ¶ 42.) In response to Plaintiffs' request, SDCK demanded that Plaintiffs pay $12,324,198.15 (the "Payoff Amount") in exchange for SDCK cancelling the foreclosure sale and releasing its

interest in the Pledged Interests.  (Am. Compl. ¶¶ 42–43.)

47.  Plaintiffs allege that although they believed the Payoff Amount was grossly excessive, they nevertheless paid the full amount demanded because they felt they lacked any alternative given the risk of losing the entirety of BOMA's ownership interest in BOMA NC.  (Am. Compl. ¶ 43.)

48.  Plaintiffs allege upon information and belief that the Kolatch Parties subsequently "resurrected the Hawaii Project[ ] but without Plaintiffs and solely for their own self-interest and benefit."  (Am. Compl. ¶ 46.)

49.  On 3 July 2025, Plaintiffs filed an Amended Complaint—which is currently their operative pleading.  In their Amended Complaint, Plaintiffs (1) added BMB and Snake River as additional Plaintiffs; (2) joined Jasper Lake, Jasper Lake Two, and Sétanta as additional Defendants; and (3) added new claims and supporting allegations against all Defendants for breach of joint venture agreement, breach of implied partnership agreement, breach of partnership agreement by estoppel, unjust enrichment, breach of fiduciary duty, misrepresentation and omission, breach of contract/improper payoff statement, economic duress, and civil conspiracy/aiding and abetting.

50.  This matter was subsequently designated a mandatory complex business case and assigned to the undersigned on 7 July 2025.  (ECF Nos. 21–22.)

51.  On 30 September 2025, Sétanta filed its Motion to Dismiss Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the North Carolina Rules of Civil Procedure.  (ECF No. 42.)  That same day, SDCK and the Kolatch Parties filed their

Motion to Dismiss, which was also brought pursuant to Rules 12(b)(1) and (6). (ECF No. 44.)

52. The Court held a hearing via Webex on the Motions to Dismiss on 21 January 2026 at which all parties were represented by counsel.

53. The Motions to Dismiss have been fully briefed and are now ripe for resolution.

## LEGAL STANDARD

54. A motion brought under Rule 12(b)(1) challenges a court's jurisdiction over the subject matter of the claimant's claims. N.C. R. Civ. P. 12(b)(1). "Subject matter jurisdiction is the indispensable foundation upon which valid judicial decisions rest," *In re T.R.P.*, 360 N.C. 588, 590 (2006), and has been defined as "a court's legal authority to adjudicate the kind of claim alleged." *In re McClatchy Co., LLC*, 386 N.C. 77, 85 (2024) (cleaned up). "[T]he proceedings of a court without jurisdiction of the subject matter are a nullity." *Burgess v. Gibbs*, 262 N.C. 462, 465 (1964) (cleaned up).

55. In determining the existence of subject matter jurisdiction, the Court may consider matters outside the pleadings. *Emory v. Jackson Chapel First Missionary Baptist Church*, 165 N.C. App. 489, 491 (2004) (cleaned up). However, "if the trial court confines its evaluation to the pleadings, the court must accept as true the plaintiff's allegations and construe them in the light most favorable to the plaintiff." *Munger v. State*, 202 N.C. App. 404, 410 (2010) (cleaned up).

56. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court

reviews the allegations in the complaint in the light most favorable to the plaintiff. *See Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017). The Court's inquiry is "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim upon which relief may be granted under some legal theory[.]" *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670 (1987). The Court accepts all well-pled factual allegations in the relevant pleading as true. *See Krawiec v. Manly*, 370 N.C. 602, 606 (2018). The Court is not, however, required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't Health & Hum. Servs., Div. of Facility Servs.*, 174 N.C. App. 266, 274 (2005) (cleaned up).

57. Furthermore, the Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 206 (2016) (cleaned up). The Court may consider these attached or incorporated documents without converting the Rule 12(b)(6) motion into a motion for summary judgment. *Id.* (cleaned up). Moreover, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant." *Oberlin Cap., L.P. v. Slavin*, 147 N.C. App. 52, 60 (2001) (cleaned up).

58. Our Supreme Court has stated that "dismissal pursuant to Rule 12(b)(6) is proper when (1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a

good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (cleaned up).

## ANALYSIS

59.     As an initial matter, all parties make arguments in their respective briefs that reference the PSA, the Pledge Agreement, the LOI, the Termination Notice, the Demand Letters, and the Notice of Sale.

60.     Because all of these documents were either attached to Plaintiffs' pleadings or expressly referenced therein (or both), the Court is able to consider them without converting Defendants' Motions into summary judgment motions. *See Moch*, 251 N.C. App. at 206.

## I.     Choice of Law

61.     Before addressing the merits of the parties' arguments, the Court must first address the issue of which state's substantive laws govern Plaintiffs' claims.

62.     With regard to Plaintiffs' claim alleging a breach of the PSA, the parties jointly agree that New York law governs this claim.

63.     Their position is based on the following provision of the PSA, which states in pertinent part as follows:

> Applicable Law; Jurisdiction.  This Agreement shall be governed by and construed in accordance with the statutory and common law of the State of New York, applicable to transactions as if made and to be wholly performed within such state, without regard to the conflicts-of-law provisions thereof.

(Am. Compl. Ex. C ¶ 18.)

64. This Court has stated the following regarding the enforceability of such contractual choice-of-law provisions:

> Our Supreme Court has endorsed the general rule "that where parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect." *Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 262, 261 S.E.2d 655 (1980). Exceptions are rare. A court may set aside a choice-of-law provision in just two narrow circumstances: first, when "the chosen state has no substantial relationship to the parties or the transaction and there is no reasonable basis for the parties' choice"; or second, when applying "the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law" if the parties had not made a choice of law. *Cable Tel Servs., Inc. v. Overland Contracting, Inc.*, 154 N.C. App. 639, 642–43, 574 S.E.2d 31 (2002) (quoting Restatement (Second) of Conflict of Laws § 187 (Am. L. Inst. 1971)).

*IQVIA, Inc. v. Cir. Clinical Sols., Inc.*, 2023 NCBC LEXIS 1, at *6–7 (N.C. Super. Ct. Jan. 6, 2023).

65. From the limited record currently before the Court, it is not entirely clear how New York has a "substantial relationship" to this lawsuit. It does not appear that any of the parties are domiciled in New York or that any of the events set out in the Amended Complaint took place there. Indeed, the only reference to New York that the Court has been able to find is in Section 4 of the PSA, which states that the closing of the transaction described therein would take place at the law office of SDCK's counsel in New York City. (*See* Am. Compl. Ex. C § 4.)

66. The Court is skeptical of the notion that this isolated provision—without more—is sufficient to give rise to a substantial relationship between New York and the parties or the contractual transaction at issue.

67.     Nevertheless, the present record is insufficient for the Court to make a definitive determination on this issue.  For this reason, the Court will apply New York law (as the parties have jointly requested) to the breach of contract claim in ruling on the present Motions, but the Court will likely reconsider the issue at a later stage of this case when the record has been more fully developed.[4]

68.     As for the remaining claims in the Amended Complaint, Plaintiffs' counsel has represented to the Court that these claims are being brought under North Carolina law.  Accordingly, the Court will analyze them as such herein.

## II.    Standing

69.     Defendants' Motions to Dismiss under Rule 12(b)(1) are based on their argument that not all of the named Plaintiffs possess standing.

70.     "Standing refers to the issue of whether a party has a sufficient stake in an otherwise justiciable controversy that he or she may properly seek adjudication of the matter." *Creek Pointe Homeowner's Ass'n, Inc. v. Happ*, 146 N.C. App. 159, 165 (2001) (cleaned up).  "As the party invoking jurisdiction, [a] plaintiff[ ] ha[s] the burden of establishing standing." *Marriott v. Chatham Cnty.*, 187 N.C. App. 491, 494 (2007) (cleaned up).  Because "[s]tanding is a necessary prerequisite to [the] court's proper exercise of subject matter jurisdiction[,]" a motion to dismiss based on a party's lack of standing is properly analyzed under Rule 12(b)(1). *United Daughters of the Confederacy, N.C. Div., Inc. v. City of Winston-Salem*, 383 N.C. 612, 649–50 (2022)

---

[4] At that time, it will be incumbent upon the parties to make a sufficient showing that a substantial relationship does, in fact, exist between New York and the parties or their contractual transaction such that the choice-of-law provision should be given effect.

(cleaned up).

71. Our Supreme Court has recently clarified that "[w]hen a person alleges the infringement of a legal right arising under a cause of action at common law, a statute, or the North Carolina Constitution, . . . the legal injury itself gives rise to standing." *Soc'y for the Hist. Pres. of the Twenty-Sixth N.C. Troops, Inc. v. City of Asheville*, 385 N.C. 744, 751 (2024) (cleaned up); *see also Mauck v. Cherry Oil Co.*, 388 N.C. 325, 331 (2025); *United Daughters of the Confederacy, N.C. Div., Inc.*, 383 N.C. at 626; *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm. (EMPAC),* 376 N.C. 558, 608 (2021).

72. Plaintiffs contend that each Plaintiff entity suffered some injury tied to Defendants' conduct for the following reasons: (1) DTLG was a party to the PSA that SDCK allegedly breached; (2) BOMA was a party to the Pledge Agreement and was forced to pay the Payoff Amount in order to avoid the sale of the Pledged Interests; (3) BOMA NC was the subject of the threatened UCC foreclosure sale; and (4) BMB and Snake River were signatories to the LOI and members of the alleged joint venture.

73. The Court concludes that Defendants have failed to demonstrate that any of the Plaintiffs lack standing. Therefore, Defendants' Motions to Dismiss under Rule 12(b)(1) are **DENIED**.

74. For the remainder of this Opinion, the Court will address Defendants' arguments based on Rule 12(b)(6). Because these arguments largely overlap, the Court deems it appropriate to analyze the Motions together.

## III. Breach of Contract/Improper Payoff Statement

75.     Under New York law, in order "to plead a cause of action for breach of contract, a plaintiff usually must allege that: (1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages[.]" *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (2022) (cleaned up).

76.     As an initial matter, Plaintiffs have clarified in their briefs in response to the Motions to Dismiss that their breach of contract claim is limited to the parties to the PSA—that is, DTLG and SDCK.

77.     This concession is logical as generally only the parties to a contract can sue for its breach. *See US Bank N.A. v. Nelson*, 36 N.Y.3d 998, 1010 (2020) ("A fundamental requirement of any breach-of-contract action is for the plaintiff to allege that it is a party to the contract (or has acquired the rights of a party)."); *Parker & Waichman v. Napoli*, 29 A.D.3d 396, 399 (N.Y. App. Div. 1st Dep't 2006) ("Plaintiff has not alleged that it is a third-party beneficiary of any contracts entered into between defendants and the referred clients. . . . In the absence of such claim, only the parties to a contract have standing to sue for its breach[.]" (cleaned up)).

78.     Indeed, the PSA expressly provides that the PSA does not confer rights upon any third parties:

> No Third Party Beneficiary.  This Agreement is intended for the exclusive benefit of the parties hereto and their respective successors and permitted assigns, and shall not create any rights in, or be enforceable by, any other person.

(Am. Compl. Ex. C § 32.)

79. Turning to the substance of this claim, DTLG essentially contends that SDCK breached the PSA based on two theories: (1) the acts of sending the Demand Letters declaring Plaintiffs to be in breach of the PSA and scheduling the UCC sale of the Pledged Interests were improper because at some point after the PSA was signed the parties had jointly decided not to move forward with their respective obligations under the agreement; and (2) even had SDCK been justified in declaring DTLG to be in breach of the PSA and in seeking to avail itself of existing remedies, the Payoff Amount demanded by SDCK was grossly excessive because the PSA would only have given SDCK the contractual right to seek accrued interest up to 30 July 2022 (the PSA's purported "Closing Date") and not thereafter.[5]

80. Although the parties have not extensively analyzed New York law in their briefs, research has disclosed at least one case in which a New York court has allowed a breach of contract claim to go forward past the pleadings stage premised on allegations that are at least somewhat analogous to those made by DTLG here. In *Vinci Brands LLC v. Case-Mate, Inc.*, 2025 N.Y. Misc. LEXIS 8209 (N.Y. App. Div. Oct. 8, 2025) (unpublished), the plaintiff ("Vinci") brought, *inter alia*, claims for breach of contract against two defendants—Siena and Case-Mate. *Id*. at *5. Vinci had previously entered into a loan agreement with Siena. *Id*. at *2. Siena later declared that Vinci was in default under their agreement, an assertion that Vinci disputed. *Id*. at *2–3.

81. Around three months thereafter, Siena "issued a notice of a UCC Article

---

[5] In addition, DTLG also contends that the amount of attorneys' fees sought by SDCK in its demand was excessive under the PSA.

foreclosure sale of the collateral securing the loan[,] . . . [but] did not accelerate the loan or exercise any other rights under the [agreement]." *Id*. at *3. A few days later, Siena entered into an agreement with Case-Mate that assigned all of Siena's rights under the loan agreement to Case-Mate in exchange for Case-Mate paying Siena certain sums. *Id*. at *3–4.

82. Shortly thereafter, Case-Mate "announced its intent to foreclose on the loan and to notice a UCC Article 9 sale of Vinci's assets." *Id*. at *4. In order to avoid Case-Mate's threat of foreclosure on the loan, Vinci paid $9,385,804 to Case-Mate. *Id*.

83. In Vinci's amended complaint, it alleged that Case-Mate breached multiple sections of the loan agreement by charging Vinci (1) a $600,000 assignment fee that Case-Mate had paid to Siena regarding its purchase of the loan; (2) legal fees that were also part of Case-Mate's purchase price for the loan; (3) $200,000 in reserve funds; and (4) compounded interest on a principal loan balance for all three of the preceding charges. *Id*. at *8, 11, 14, 16. Case-Mate moved to dismiss Vinci's breach of contract claims against it in their entirety. *See id*. at *5.

84. The court denied Case-Mate's motion to dismiss. As for the assignment fee, the court found that nothing in the loan agreement obligated Vinci to pay that fee. *Id*. at *11. With regard to the legal fees, the court found that "Case-Mate provide[d] no explanation as to how [the agreement] authorized it to charge Vinci those fees." *Id*. at *12. As for the reserve funds, the court noted that the loan agreement explicitly required Case-Mate to refund such funds after Vinci paid off the

loan. *Id*. at *15–16. Having found no support in the loan agreement for Vinci's obligation to pay any of the three above-referenced categories of money, the court determined that it could not yet be established "whether [those] fees were monetary obligations subject to interest calculation pursuant to [the agreement]." *Id*. at *17.

85. In the present case, SDCK's primary argument in support of dismissal of DTLG's breach of contract claim is that (1) DTLG's failure to pay the Purchase Price by the 30 July 2022 Closing Date as set out in the PSA amounted to a breach of the contract; and (2) SDCK was therefore entitled to seek all available remedies (including foreclosure of the Pledged Interests under the Pledge Agreement).

86. However, Plaintiffs have alleged in their Amended Complaint that upon SDCK's decision to postpone the Auction Date (concerning the Iron Horse Loan) the parties mutually agreed not to go forward with their respective obligations under the PSA, including DTLG's obligation to pay the Purchase Price. Specifically, they have alleged the following:

> Under the PSA, DTLG agreed that, should all covenants and terms of the PSA be met, it would purchase the Iron Horse Loan for an amount equal to the greater of (i) $8,014,667.00 or (ii) $7,781,229.79, plus an amount equal to eighteen percent per annum from the date of the PSA through the Closing Date (the "**Purchase Price**"). Closing Date was clearly defined in the PSA as July 30, 2022 (the "Closing Date"). *See* the PSA at § 1, 3–4. The Closing Date was set as the same day as the Auction Date because, as explained herein, the parties intended for SDCK to purchase the Iron Horse Loan to avoid the Iron Horse Auction, then immediately "sell" the same to DTLG under the PSA in exchange for equity in the Encumbered Parcel up to the amount of the Purchase Price.
>
> . . .
>
> During this time, SDCK, at the direction of the Kolatch Parties and as

the owner of the Iron Horse Loan, elected to postpone the Auction Date indefinitely. This move obliterated the purpose of the PSA, as the Closing Date thereunder was intended to be contemporaneous with the Auction Date, so Plaintiffs could take title to the Encumbered Property, and SDCK could acquire an equity interest up to the Purchase Price.

Importantly, at no time did the Plaintiffs agree to postpone the Closing Date. Rather, SDCK (with the approval and knowledge of the Kolatch Parties) elected to postpone the Auction Date. Further, on the July 30, 2022 Closing Date, neither SDCK nor any of the Kolatch Parties made a demand that DTLG deliver the Purchase Price, nor did they even mention the topic, because it was well understood that the closing under the PSA was contingent on the Iron Horse Auction being completed on the same day. The parties, instead, continued working jointly towards the larger Hawaii Project, and continued engaging investors, vendors, politicians, and other necessary parties.

. . .

Eventually, SDCK elected to reschedule the Auction Date to January 17, 2024 and moved forward with the Iron Horse Auction. SDCK made no demand at that time that DTLG purchase the Iron Horse Loan as set forth in the PSA. Instead, on advice of their mutual counsel, the parties determined that SDCK . . . should acquire title to the Encumbered Parcel. Upon completion of the Iron Horse Auction, SDCK did just that.

SDCK, however, did not remain the owner of the Encumbered Parcel for long. In late 2024, the holder of the Seller Financing Loan foreclosed on the Encumbered Parcel, and SDCK's interest therein was extinguished. This rendered the value of the Iron Horse Loan, which was once to be sold through the now-terminated PSA, worthless and represented a huge loss for the joint venture.

. . .

DTLG and SDCK each executed the PSA, pursuant to which DTLG agreed to purchase the Iron Horse Loan for the Purchase Price on the Closing Date.

. . .

SDCK, by and through the Kolatch Parties, entered into numerous discussions with Plaintiffs pursuant to which SDCK elected not to require DTLG to deliver the Purchase Price on the Closing Date.

SDCK thereafter unilaterally terminated the PSA.

Following SDCK's termination of the PSA, SDCK undertook efforts to complete the Iron Horse Auction and foreclose on the Encumbered Parcel. Following such foreclosure, the Iron Horse Loan was rendered valueless by SDCK, as all rights thereunder had been exercised in exchange for title to the Encumbered Property.

Despite rendering the Iron Horse Loan valueless, SDCK demanded DTLG deliver to it the entire Purchase Price under the PSA, in exchange for nothing, and threatened to enforce the Pledge unless such amounts were received.

SDCK had terminated the PSA and had rendered the collateral to be sold under the PSA worthless. As a result, SDCK had waived any right it had to seek to recover the Purchase Price under the PSA.

. . .

In addition, even if SDCK had not waived its rights under the PSA and somehow had the right to demand payment thereunder, SDCK's calculation of the Purchase Price under the PSA was erroneous, and, despite demands from Plaintiffs, SDCK refused to correct the erroneous payoff.

Specifically, the Purchase Price under the PSA was, in relevant part, "$7,781,229.79, plus an amount equal to eighteen percent per annum from the date of the PSA *through the Closing Date*." *See* the PSA at § 1, 3–4 (emphasis added). The Closing Date is a defined term. This provision does not give SDCK free reign to charge eighteen percent per annum interest in perpetuity. Nor does the PSA contain a default interest rate. Thus, SDCK's inclusion of the 18% interest rate in the payoff was wholly improper. Further, upon information and belief, SDCK included certain attorneys' fees and costs that were not to be included in the Purchase Price pursuant to the express terms thereof.

Despite performance by Plaintiffs (*i.e.*, delivery of the erroneous Purchase Price), SDCK breached its obligations under the PSA by failing to deliver the correct payoff amount and by refusing to cancel the Schedule [sic] UCC Sale unless and until Plaintiffs delivered to it the erroneous payoff amount.

. . .

> Plaintiffs have incurred damage[ ] as a result of SDCK's actions in that, in order to preserve the Pledged Collateral, Plaintiffs were forced to deliver more than $12 million to SDCK—an amount that far exceeds any amounts to which SDCK was entitled to receive under the PSA.

(Am. Compl. ¶¶ 24, 28–29, 34–35, 95, 97–101, 103–05, 107.)

87. Admittedly, these allegations are not crystal clear in certain respects as to what exactly transpired between the parties during this time period. Nevertheless, taking these allegations as true (as the Court must do under Rule 12(b)(6)), SDCK has failed to show as a matter of law that Plaintiffs' allegations are insufficient to state a claim for breach of contract under New York law.[6]

88. Therefore, Defendants' Motions to Dismiss as to Plaintiffs' breach of contract claim are **DENIED** as to SDCK but are **GRANTED** as to all other Defendants. Moreover, the breach of contract claim shall be permitted to go forward solely on behalf of DTLG.

## IV. Economic Duress

89. North Carolina law recognizes a cause of action for economic duress.

90. Economic duress "exists where one, by the unlawful act of another, is induced to make a contract or perform or forego some act under circumstances which deprive him of the exercise of free will[,]" and its existence rests on an analysis of "the totality of the circumstances." *Radford v. Keith*, 160 N.C. App. 41, 43–44 (2003) (cleaned up). "Illegality is the foundation on which a claim of coercion or duress must

---

[6] To the extent that SDCK has raised additional arguments in support of the dismissal of DTLG's breach of contract claim, the Court finds that it would benefit from a more factually developed record before addressing those arguments.

exist." *Bell Bakeries, Inc. v. Jefferson Standard Life Ins. Co.*, 245 N.C. 408, 419 (1957). But a "threat to institute legal proceedings, criminal or civil, which might be justifiable, *per se*, becomes wrongful . . . if made with the corrupt intent to coerce a transaction grossly unfair to the victim and not related to the subject of the proceedings." *Link v. Link*, 278 N.C. 181, 194 (1971) (cleaned up). In addition, "it must appear that there was no immediate and adequate remedy in the courts which would enable the buyer to resist the seller's demand." *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 665 (1973) (cleaned up).

91. However, "mere breach or threat of breach of contract, without more, is insufficient to establish a claim or defense of duress." *George Shinn Sports, Inc. v. Bahakel Sports, Inc.*, 99 N.C. App. 481, 487 (1990) (cleaned up).

92. "[A] threat to breach a contract, if it does create severe economic pressure upon the other party, can constitute duress where the threat is effective because of economic power *not derived from the contract itself*." *Rose*, 282 N.C. at 665 (emphasis added); *see also Loyd v. Griffin*, 2021 NCBC LEXIS 110, at \*19–20 (N.C. Super. Ct. Dec. 10, 2021) (holding that duress was insufficiently pled where the "Amended Complaint [did] not contain allegations regarding an *external* source of power that, combined with Plaintiff's threatened breach, gave [defendant] means to exert duress over [plaintiff]") (emphasis added); *In re Outer Banks Ventures, Inc.*, 556 B.R. 199, 206 (E.D.N.C. 2016) ("Instead of possessing independent economic power that allowed [defendant] to impose severe economic pressure on the plaintiffs, the documents establish that [defendant] merely acted in accordance with his contractual

rights.").

93. In addition, "[a] threat to do what one has a legal right to do cannot constitute duress." *Bell Bakeries*, 245 N.C. at 419; *see also In re Outer Banks*, 556 B.R. at 205 ("In the absence of a duty or obligation to facilitate the sale, it could not have been wrongful or unlawful for [defendant] to refuse to release his security interest. [Defendant] was entitled to stand on his legal rights." (cleaned up)).

94. As an initial matter, Plaintiffs' economic duress claim here is based on actions allegedly taken by (and against) the parties to the PSA and the Pledge Agreement. In other words, this claim—assuming it has been properly stated at all—could only be brought by DTLG and BOMA (as Plaintiffs) against SDCK (as Defendant).

95. Having carefully reviewed the Amended Complaint and the case law from North Carolina courts addressing economic duress, the Court finds that Plaintiffs have failed to state a valid claim for relief with regard to this cause of action for several reasons.

96. First, and perhaps most basically, any economic power that SDCK wielded over DTLG and BOMA derived not from any external source but rather from the PSA and the Pledge Agreement that the parties had executed.

97. Stripped to its essence, the key facts underlying the economic duress claim here are (1) that one party to a contract notified the other contracting party that it was in breach; and (2) that the non-breaching party intended to pursue a contractual remedy that the parties (all of whom were sophisticated entities) had

bargained for involving the sale of collateral that the breaching party (or its affiliated entity) had pledged to support its contractual obligation. This scenario falls outside the parameters of an economic duress claim as recognized under North Carolina law.

98. Second, it is important to note that Plaintiffs did not lack a remedy to contest SDCK's threatened action. Not only were DTLG and BOMA free to seek judicial intervention to prevent the planned sale of the Pledged Interests, but they actually did so by filing the initial incarnation of this lawsuit. Indeed, they moved for entry of a temporary restraining order (ECF No. 3) to enjoin SDCK from going forward with the UCC sale and (as Plaintiffs' counsel conceded at the 21 January hearing) they made the same arguments they are now asserting as to why they believed SDCK lacked a legal right to conduct the sale. Nevertheless, the superior court judge who heard the motion declined to issue a temporary restraining order. (ECF No. 6.) Although Plaintiffs were unsuccessful in actually obtaining a temporary restraining order, they do not dispute the fact that they were given a full and fair opportunity to seek one. *Cf. Rose*, 282 N.C. at 666 (finding economic duress where it was "apparent that plaintiff had no immediate and adequate remedy in the courts which would have enabled him to resist defendant's demands" (cleaned up)); *Blackwell v. Gastonia*, 181 N.C. 378, 380–81 (1921) (affirming finding of duress and stating that duress occurs when the payee "has no other means, or reasonable means, of immediate relief except by making payment" (cleaned up)).

99. Third, although Plaintiffs argue as if the 7 February 2025 Demand Letters essentially came out of the blue, the record refutes this notion. To the

contrary, the 14 December 2023 Termination Notice (which was sent approximately fourteen months earlier) expressly informed DTLG that SDCK deemed it to be in default under the PSA and that SDCK was reserving all of its rights and remedies, including those set out in the Pledge Agreement.

100. Plaintiffs seek to characterize the 14 December Termination Notice as simply a memorialization of the parties' joint agreement that the PSA was no longer in effect in light of the changed circumstances stemming from the postponement of the Iron Horse Auction Date. But that characterization is belied by the clear language of the document.

101. On a similar note, Plaintiffs' briefs read as if the threat to BOMA's continued ownership of BOMA NC was a wholly unforeseen occurrence. To the contrary, as discussed above, it was *BOMA* that made a voluntary decision to pledge its ownership interests in BOMA NC as collateral for DTLG's obligations under the PSA. While Plaintiffs' duress claim appears to hinge on the fact that BOMA's ownership interests in BOMA NC was worth substantially more than the Payoff Amount SDCK was demanding, this dilemma was largely of BOMA's own making by virtue of its decision to sign the Pledge Agreement in the first place.[7]

102. For all of these reasons, Defendants' Motions to Dismiss are **GRANTED**

---

[7] Although not mentioned by either side in their briefs, the Court observes that SDCK's 7 February Demand Letter to BOMA and BOMA NC offered to resolve all disputes between the parties for a payment in the amount of $6,500,000—an amount that would have been significantly less than the Purchase Price stated in the PSA. (Am. Compl. Ex. G, at 5.) Although the present record does not disclose why Plaintiffs refused to accept this settlement offer, the very fact that it was made further refutes the notion that Plaintiffs were under actual duress.

as to Plaintiffs' economic duress claim, and that claim is **DISMISSED** with prejudice.

## V. Breach of Implied Partnership Agreement/Breach of Joint Venture Agreement

103. Because these two claims fail for similar reasons, the Court elects to address them together.

104. The North Carolina Uniform Partnership Act defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit." N.C.G.S. § 59-36(a).

105. "A contract, express or implied, is essential to the formation of a partnership." *Cutter v. Vojnovic*, 388 N.C. 1, 16 (2025) (cleaned up). "A partnership may be formed by an oral agreement." *Id.* (cleaned up). Moreover, even without an express agreement, "[a] partnership may be inferred from all the circumstances, so long as the circumstances demonstrate a meeting of the minds with respect to the material terms of the partnership agreement." *Compton v. Kirby*, 157 N.C. App. 1, 11 (2003). "Courts have considered a variety of circumstances as indicative of a partnership, including, among other things, the filing of a joint tax return, establishment of a partnership bank account, obtaining state licensing as a partnership, and capital contribution[s] by members of the alleged partnership." *La Familia Cosmovision, Inc. v. Inspiration Networks*, 2014 NCBC LEXIS 52, at \*15–16 (N.C. Super. Ct. Oct. 20, 2014) (cleaned up).

106. Although North Carolina courts "have considered a variety of factors in evaluating whether a partnership exists, 'co-ownership and sharing of any actual profits are indispensable requisites for a partnership.'" *Williams v. Hammer*, 2015

NCBC LEXIS 81, at \*10–11 (N.C. Super. Ct. Aug. 12, 2015) (quoting *Best Cartage, Inc. v. Stonewall Packaging, LLC,* 219 N.C. App. 429, 438 (2012) (emphasis omitted)).

107. A joint venture exists where there is "(1) an agreement, express or implied, to carry out a single business venture with joint sharing of profits, and (2) an equal right of control of the means employed to carry out the venture." *Sykes v. Health Network Sols., Inc.,* 372 N.C. 326, 340–41 (2019) (cleaned up). "The second element requires that the parties to the agreement stand in the relation of principal, as well as agent, as to one another." *Se. Shelter Corp. v. Btu, Inc.,* 154 N.C. App. 321, 327 (2002) (cleaned up). Even where there is sufficient evidence to show one party served as an agent to the other, if there is nothing showing a reciprocal agent relationship, then no joint venture can be established. *See Cheape v. Town of Chapel Hill,* 320 N.C. 549, 562 (1987) ("Accordingly, while the agreement might establish Fraser as an agent of the Town for the limited purpose of authorizing minor change orders, there is nothing in the agreement that establishes the Town as an agent of Fraser." (emphasis omitted)).

108. "To constitute a joint adventure, the parties must combine their property, money, efforts, skill, or knowledge in some common undertaking. The contributions of the respective parties need not be equal or of the same character, but there must be some contribution by each coadventurer of something promotive of the enterprise." *Pike v. Wachovia Bank & Trust Co.,* 274 N.C. 1, 9 (1968) (cleaned up).

109. "In North Carolina, joint ventures are similar to partnerships, and they are 'governed by substantially the same rules.'" *Azalea Garden Bd. & Care, Inc. v.*

*Vanhoy*, 2009 NCBC LEXIS 10, at *10 (N.C. Super. Ct. Mar. 17, 2009) (cleaned up); *see Jones v. Shoji*, 336 N.C. 581, 585 (1994) (stating that the Court of Appeals correctly looked to the Uniform Partnership Act when analyzing a joint venture claim); *Morris Int'l, Inc. v. Packer*, 2021 NCBC LEXIS 16, at *17 (N.C. Super. Ct. Feb. 22, 2021) ("A joint venture is governed by partnership law, as codified in the Uniform Partnership Act." (cleaned up)).

110. The main distinction between a partnership and a joint venture is that the latter is "narrower in scope and purpose." *Jones v. Shoji*, 110 N.C. App. 48, 51 (1993) (cleaned up).

111. Plaintiffs concede that neither the LOI nor the PSA—the only two documents executed by any combination of Plaintiffs and Defendants other than the Pledge Agreement —expressly created a partnership or joint venture.

112. Indeed, the PSA expressly provides that it does not create a partnership or joint venture:

> Decision to Purchase. . . . [DTLG] is not relying upon the continued actions or efforts of [SDCK] in connection with its decision to purchase the Loan and *nothing contained in this Agreement shall create any partnership, joint venture or other similar arrangement between [SDCK] and [DTLG].*
>
> . . .
>
> No Partnership or Joint Venture. *This Agreement shall not be construed as creating a partnership or joint venture.* Neither party shall have any claim against the other with respect to any separate dealings, ventures, or assets of the other party, nor shall either party be liable for the other party's commitments, obligations, or liabilities in any business or personal dealings, other than the proposed transaction.

(Am. Compl. Ex. C §§ 8(b), 29 (emphasis added).)

113. Moreover, the LOI plainly states that it is non-binding on the parties.

> This proposal is not a commitment to invest but is a proposed Letter of Intent issued for discussion purposes only. This Letter of Intent represents a *non-binding* expression of interest on behalf of BMB to provide a guaranty of certain financing of the Project, and possible future acquisition capital, subject to BMB's satisfactory review of all customary and required due diligence and any other conditions BMB may elect to impose.

(Am. Compl. Ex. A, at 1 (emphasis added).)

114. This Court has held that similar language in a letter of intent supported a finding that no joint venture had been established. *See JDH Cap., LLC v. Flowers*, 2009 NCBC LEXIS 8, at *15–23 (N.C. Super. Ct. Mar. 13, 2009) (finding no joint venture where the letter of intent between the parties included language stating that it was non-binding); *see also Durham Coca-Cola Bottling Co. v. Coca-Cola Bottling Co. Consol.*, 2003 NCBC LEXIS 5, at *23–24, 33 (N.C. Super. Ct. Apr. 28, 2003) ("The acceptance of a proposal to make a future contract, the terms of which are to be subsequently fixed, is not binding." (cleaned up)).

115. This Court's analysis in *JDH Capital, LLC* is particularly instructive.

> The [Letter of Intent] itself supports a finding that it was a non-binding agreement. This case falls squarely within the holding of this Court in *Durham Coca-Cola Bottling Co. v. Coca-Cola Bottling Co. Consolidated*, 2003 NCBC 3 (N.C. Super. Ct. Apr. 28, 2003), http://www.ncbusinesscourt.net/opinions/2003%20NCBC%203.htm (holding that a letter of intent was not a valid or enforceable contract). The Letter of Intent here is similar to the Letter of Intent in *Durham Coca-Cola* in that (1) the document in this case says on its face it is a letter of intent and that it is non-binding, (2) the document contemplates the execution of a more complete agreement, (3) there is no language inferring an intent to be bound, and (4) a comparison of the length of the Letter of Intent and the proposed joint venture agreement demonstrates the numerous material terms yet to be determined when the Letter of Intent was signed.

. . .

> The Court's conclusion that the Letter of Intent was non-binding is further supported by the nature of the transaction. The completion of a real estate development project, and its ongoing management in a joint venture, generally require the execution of lengthy, sophisticated, and detailed documents to govern the relationships between the parties.

*JDH Cap., LLC*, 2009 NCBC LEXIS 8, at *15, 19.

116. Moreover, the Amended Complaint fails to sufficiently allege the essential elements of a partnership.

> Plaintiffs and Defendants entered into a partnership with the objective to acquire and develop the Hawaii Project. As part of this partnership, the parties agreed to share in the profits and losses.
>
> . . .
>
> Each of the Plaintiffs and Defendants worked together and in tandem, pooling resources, to carry on as partners in furtherance of the Hawaii Project, and agreed to share in the profits and losses, and to utilize their respective business skills in furtherance of the partnership.

(Am. Compl. ¶¶ 57, 59.)

117. In addition to the fact that these allegations are merely conclusory, there are no assertions of co-ownership between the parties. Nor are there any allegations as to the existence of the other factors that North Carolina courts have held relevant to the determination of whether a partnership exists. *See Cutter*, 388 N.C. at 18 ("Furthermore, a review of the undisputed evidence reveals no indicia of a partnership. Plaintiff and defendant Vojnovic never registered a partnership name, made capital contributions to a partnership entity, set up bank accounts for a purported partnership, or filed partnership tax returns.").

118. Plaintiffs have also failed to adequately plead the existence of the essential elements of a joint venture—that is, an agreement to share profits and an equal right of control.

119. The references in the Amended Complaint to the sharing of profits from an alleged joint venture read as follows:

> BMB and Jasper Lake combined their property, effects, labor, and skills in a common venture—the Hawaii Project—under an agreement to share the profits or losses in equal or specified proportions[.]
>
> . . .
>
> As part of the joint venture agreement, Plaintiffs and Defendants agreed that they would share in the expenses incurred by the partnership and they would also share in the future profits to be generated from the Hawaii Project.

(Am. Compl. ¶¶ 49, 51.)

120. These broad allegations of sharing of profits are too conclusory to support a joint venture claim. *See Orange Peel Events, LLC v. Ninja Brewing, Inc.*, 2025 NCBC LEXIS 95, at *10 (N.C. Super. Ct. July 30, 2025) (rejecting allegations in amended complaint as to existence of joint venture as impermissibly conclusory).

121. The most relevant allegations on the issue of equal control between the parties are in paragraphs 30, 48, and 49 of the Amended Complaint, which read as follows:

> The joint venture was so concrete and solidified that, on occasions too numerous to count, Mr. Kolatch and Sétanta represented to third parties that Plaintiffs, and their principals, were in fact members of SDCK. This meant invoices and/or communications for SDCK were frequently addressed to principals of Snake River and BMB, and these principals were given authorization to sign and contract with third parties on behalf of SDCK. The parties even shared legal counsel as

they worked towards completion of the foreclosure of the Encumbered Parcel and a broader purchase of the Hawaii Real Estate.

. . .

Plaintiffs and Defendants entered into a joint venture partnership with the objective to acquire and develop the Hawaii Project.

In connection with this joint venture, Plaintiffs and Defendants jointly worked together to negotiate the purchase of the Hawaii Real Estate and the development of the Hawaii Project. . . . BMB and Jasper Lake acted as each other's agents when dealing with third parties with respect to matters appertaining to the Hawaii Project and within the scope of their business.

(Am. Compl. ¶¶ 30, 48–49.)

122. Similarly, these allegations regarding the control element are simply too vague. *See Orange Peel Events, LLC*, 2025 NCBC LEXIS 95, at *10 ("To be sure, the amended complaint alleges in conclusory fashion that the parties formed a joint venture and agreed to share joint control. But the Court need not accept conclusory allegations." (cleaned up)); *Synovus Bank v. Parks*, 2013 NCBC LEXIS 36, at *8–9 (N.C. Super. Ct. July 30, 2013) (finding allegations that a party had "some measure to direct the conduct of the [alleged joint venture]" was a "conclusion of law" and was not adequate to allege the equal control element of a joint venture claim (emphasis omitted)).

123. Notably, the terms of the LOI further undermine Plaintiffs' arguments on this issue.

124. Plaintiffs state in paragraph 20 of the Amended Complaint that the LOI described the parties' "plan" to proceed with what Plaintiffs claim ultimately became a joint venture. (Am. Compl. ¶ 20.) However, the proposal set out in the LOI was

actually the following: Sétanta would form an entity referred to as "Newco" as a special purpose entity; Sétanta would loan $90,000,000 to Newco; BMB would provide a series of loans and guaranties to Newco in exchange for a 15% membership interest in Newco; Newco would buy Lulana Gardens, LLC's fee simple interest in the Hawaii Real Estate; a series of transactions would occur that would allow BMB to own a fee simple interest; and Snake River would ultimately develop the "Newco Project." (Am. Compl. ¶¶ 20–21; Am. Compl. Ex. A, at 2–3.)

125. Thus, instead of describing the relationship of co-adventurers in a joint venture with equal right to control the actions of the other parties, the LOI essentially describes a series of proposed real estate transactions and financing arrangements, referring at one point to BMB's role as that of a "passive investor." (Am. Compl. Ex. A, at 1–4.)

126. Finally, the Amended Complaint alleges that the joint venture entity was *SDCK itself*, a contention that fails for several reasons. Plaintiffs allege the following in this regard:

> Defendant SDCK was created and utilized *as a joint venture entity* with respect to the Hawaii Project.
>
> . . .
>
> Specifically, the Kolatch Parties and Sétanta agreed to create and fund a new entity—SDCK—to purchase the Iron Horse Loan and then reset the Auction Date to July 30, 2022.
>
> . . .
>
> [T]he Kolatch Parties, through monies paid to SDCK, *a joint venture partnership entity*, have unjustly retained a more than $4 million profit from the failed Hawaii Project.

(Am. Compl. ¶¶ 7, 19, 45 (emphasis added).)

127. However, there are fatal defects with the theory that SDCK served as the alleged joint venture entity.

128. First, the Amended Complaint expressly states that SDCK was formed as a limited liability company. (Am. Compl. ¶ 7); *see Cutter*, 388 N.C. at 18 (finding "no indicia of a partnership" where, among other reasons, the entity at issue was formed as a limited liability company and not as a general partnership, which "indicate[d] a desire to pursue a business relationship with the protections of a limited liability company"); *Orange Peel Events, LLC*, 2025 NCBC LEXIS 95 at *8–9 (finding no joint venture where the parties "chose to form an LLC, not an unincorporated joint venture, to buy and own the land" at issue); *Strategic Mgmt. Decisions v. Sales Performance Int'l*, 2017 NCBC LEXIS 69, at *14–15 (N.C. Super. Ct. Aug. 7, 2017) (finding no joint venture where the parties "chose to organize their joint enterprise as an LLC").

129. Second, Plaintiffs concede in the Amended Complaint that SDCK was created/controlled *by the Kolatch Parties*: "SDCK . . . was created by the Kolatch Parties and controlled by them[.]" (Am. Compl. ¶ 27.) *See Sykes*, 372 N.C. at 340–41 (stating that a joint venture requires "an *equal right of control* of the means employed to carry out the venture" (emphasis in original)).

130. Therefore, for all of these reasons, Defendants' Motions to Dismiss are **GRANTED** as to Plaintiffs' claims for breach of implied partnership agreement and for breach of joint venture agreement, and those claims are **DISMISSED** with

prejudice.

## VI. Breach of Partnership Agreement by Estoppel

131.    Plaintiffs have also asserted a cause of action based on partnership by estoppel.  This claim likewise fails.

132.    N.C.G.S. § 59-46 states in pertinent part as follows:

When a person, by words spoken or written, by conduct, or by contract, represents himself, or consents to another representing him to anyone, as a partner in an existing partnership or with one or more persons not actual partners, he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership[.]

N.C.G.S. § 59-46(a).

133.    Plaintiffs contend that Defendants' representations to third parties that the parties were, in fact, engaged in a partnership gave rise to a partnership by estoppel because Plaintiffs themselves relied on those representations to their detriment.  However, this argument reflects a misunderstanding of this doctrine.

134.    The Amended Complaint alleges the following:

[A]gents of the BMB Parties together with Mr. Kolatch met with the Mayor of "the Big Island," where the Hawaii Project was located, on numerous occasions, and would represent that they were all one and the same entity, SDCK, working to acquire the Hawaii Real Estate, including the Encumbered Parcel.

Essentially, from the outside looking in, SDCK was a single entity comprised of the Kolatch Parties, certain BMB Parties and Sétanta. These parties presented a unified front, through the joint venture entity of SDCK, and worked together for a common goal—the acquisition and development of the Hawaii Project.

. . .

Here, Plaintiffs relied on the representations of Defendants that the

> parties were representing each other in partnership and working together towards the joint venture in partnership.
>
> Here, the Parties both internally, among the group, and externally, to stakeholders and politicians interested in the Hawaii Project, purported to be one and the same, a cohort in partnership in furtherance of the Hawaii Project.
>
> Defendants regularly, through actions and conduct, made clear the parties were in fact partners, and Plaintiffs relied on this belief to their detriment.
>
> Defendants breached this partnership agreement, and in light of the clear facts should be estopped from arguing that a partnership did not exist.

(Am. Compl. ¶¶ 31–32, 65–68.)

135. North Carolina case law makes clear, however, that a claim for partnership by estoppel only applies to claims *brought by a third party* against an alleged partnership. *See, e.g.*, *Laws. Paralegal Training Programs, LLC v. Guilford Coll.*, 2013 N.C. App. LEXIS 109, at *9 (2013) (unpublished) ("Plaintiff's reliance on the doctrine of partnership by estoppel is misplaced because it speaks to a partnership's liability to a third-party. Here, plaintiffs' claim is not based on any representations to a third-party. Therefore, the doctrine of partnership by estoppel is not applicable to the facts of this case."); *see also La Familia Cosmovision, Inc.*, 2014 NCBC LEXIS 52, at *22 n.54.

136. The present action is likewise not being brought by a third party alleging that it was induced by the acts or statements of Defendants to believe that it was dealing with a partnership. Plaintiffs have failed to cite any North Carolina case law allowing a partnership by estoppel claim to be brought by one of the members of the

alleged partnership against one or more of the other members.

137. Accordingly, Defendants' Motions to Dismiss are **GRANTED** as to Plaintiffs' claim for breach of partnership agreement by estoppel, and that claim is **DISMISSED** with prejudice.

## VII. Breach of Fiduciary Duty

138. It is well-settled that "[t]o establish a claim for breach of fiduciary duty, a plaintiff must show that: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to the plaintiff." *Sykes*, 372 N.C. at 339 (cleaned up).

139. "[T]o make out a claim for breach of a fiduciary duty, plaintiffs must first allege facts that, taken as true, demonstrate that a fiduciary relationship existed between the parties." *Sykes*, 372 N.C. at 339–40. North Carolina courts recognize two types of fiduciary duties—those that "arise by operation of law (*de jure*)" and those that are "based on the facts and circumstances (*de facto*)[.]" *Lockerman v. S. River Elec. Mbrshp. Corp.*, 250 N.C. App. 631, 635 (2016) (cleaned up).

> [The fiduciary duty] not only includes all legal relations [(*de jure*)], such as attorney and client, broker and principal, executor or administrator and heir, legatee or devisee, factor and principal, guardian and ward, partners, principal and agent, trustee and *cestui que trust*, but it extends to any possible case in which a fiduciary relation exists in fact, and in which there is a confidence reposed on one side, and resulting domination and influence on the other [(*de facto*)].

*Id.* at 635–36 (cleaned up).

140. Plaintiffs have made clear that they are asserting a *de jure* fiduciary relationship—based on the duty owed by the members of a partnership or joint

venture to each other. *See Hajmm Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 588 (1991) ("Business partners . . . are each other's fiduciaries as a matter of law." (cleaned up)); *New Friendship Used Clothing Collection, LLC v. Katz*, 2017 NCBC LEXIS 72, at *31–32 (N.C. Super. Ct. Aug. 18, 2017) (finding that members of the joint venture owed fiduciary duties to each other); *Crescent Foods, Inc. v. Evason Pharmacies, Inc.*, 2016 NCBC LEXIS 76, at *17 (N.C. Super. Ct. Oct. 5, 2016) ("[P]artners in a general partnership owe one another fiduciary duties[.]").

141. However, for the reasons set out above, the Court has ruled that neither a partnership nor a joint venture actually existed between Plaintiffs and Defendants. As a result, Plaintiffs' sole theory as to the existence of a fiduciary relationship fails.

142. Therefore, dismissal of Plaintiffs' breach of fiduciary duty claim is proper, and that claim is **DISMISSED** with prejudice.

## VIII. Unjust Enrichment

143. "In North Carolina, to recover on a claim of unjust enrichment, Plaintiff must prove: (1) that it conferred a benefit on another party; (2) that the other party consciously accepted the benefit; and (3) that the benefit was not conferred gratuitously or by an interference in the affairs of the other party." *Islet Scis., Inc. v. Brighthaven Ventures, LLC*, 2017 NCBC LEXIS 4, at *16 (N.C. Super. Ct. Jan. 12, 2017) (citing *Se. Shelter Corp.*, 154 N.C. App. at 330).

144. "The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express contract to pay, the law will imply a promise to pay a fair compensation

therefor." *Atl. Coast Line R.R. Co. v. State Highway Comm'n of N.C.*, 268 N.C. 92, 95–96 (1966) (cleaned up). However, "[i]f there is a contract between the parties[,] the contract governs the claim and the law will not imply a contract." *Booe v. Shadrick*, 322 N.C. 567, 570 (1988) (cleaned up).

145. Plaintiffs assert two theories in support of their unjust enrichment claim.

146. First, Plaintiffs claim they are entitled to a return of the approximately $12.3 million they paid to SDCK pursuant to the PSA and Pledge Agreement. However, as noted above, an unjust enrichment claim cannot exist where the relationship between the parties is governed by contract. Here, as discussed in detail above, the circumstances under which BOMA paid the Payoff Amount were based on the PSA and Pledge Agreement between DTLG and BOMA with SDCK.

147. Furthermore, it is illogical on these facts to suggest that the parties understood that the Payoff Amount being made in response to the demand by SDCK would later be paid back to DTLG or BOMA.

148. Second, Plaintiffs claim that Defendants have been unjustly enriched because Plaintiffs contributed significant sums in furtherance of the Hawaii Project and that Defendants are now seeking to resume the Hawaii Project (with new business associates) after eliminating Plaintiffs' ability to participate therein.

149. However, these allegations likewise fail to satisfy the elements of an unjust enrichment claim. There are no non-conclusory allegations that it was understood by the parties that Plaintiffs would be repaid any money or for any time

or resources they contributed to the Hawaii Project. Further, there are no allegations that Defendants have tangibly benefited from Plaintiffs' efforts by successfully acquiring the Hawaii Real Estate. *See, e.g.*, *Leonard v. Ast*, 2022 NCBC LEXIS 76, at *15–17 (N.C. Super. Ct. July 13, 2022) (cleaned up) (granting motion to dismiss unjust enrichment claim under Rule 12(b)(6) where the plaintiff failed to allege that her capital contributions to the company were made with expectation of repayment because "alleging only that the [defendants] might benefit from the business venture does not state a claim for unjust enrichment" (cleaned up)); *KNF Techs., LLC v. Tutton*, 2019 NCBC LEXIS 72, at *36 (N.C. Super. Ct. Oct. 9, 2019) ("Alleging merely that the Defendants have taken for themselves some benefit to which Plaintiff believes it is rightfully entitled does not state a claim for unjust enrichment."); *Chisum v. Campagna*, 2017 NCBC LEXIS 102, at *32 (N.C. Super. Ct. Nov. 7, 2017) (granting motion to dismiss unjust enrichment claim where the plaintiff "[did] not allege that he conferred any benefit on the [defendants], but rather only that the [defendants] 'received' or 'wrongfully retained' benefit from their alleged misconduct").

150. Accordingly, Defendants' Motions to Dismiss as to Plaintiffs' unjust enrichment claim are **GRANTED**, and that claim is **DISMISSED** with prejudice.

## IX. Misrepresentation and Omission

151. Plaintiffs also contend that Defendants made both fraudulent and negligent misrepresentations.

152. To prove a claim of fraudulent misrepresentation, "the party asserting

it must show (i) false representation or concealment of a material fact, (ii) reasonably calculated to deceive, (iii) made with intent to deceive, (iv) which does in fact deceive, (v) resulting in damage to the injured party." *Taylor v. Gore*, 161 N.C. App. 300, 303 (2003) (cleaned up). A claim for fraudulent misrepresentation is held to a heightened pleading standard under North Carolina Rule of Civil Procedure 9(b). *See Stamatakos v. Carolina Urology Partners, PLLC*, 2024 NCBC LEXIS 28, at *19 (N.C. Super. Ct. Feb. 20, 2024).

153. To satisfy Rule 9(b)'s particularity requirement, a plaintiff must allege the "time, place and content of the fraudulent representation, identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations." *Terry v. Terry*, 302 N.C. 77, 85 (1981). "The alleged misrepresentations must also be definite and specific, meaning that they must be more than mere puffing, guesses, or assertions of opinions but actual representations of material facts." *Aldridge v. Metro. Life Ins. Co.*, 2019 NCBC LEXIS 116, at *76 (N.C. Super. Ct. Dec. 31, 2019) (cleaned up).

154. "The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206 (1988).

155. In the context of a claim for negligent misrepresentation, liability occurs where

> [o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies

false information for the guidance of others in their business transactions, [and thus] is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Kindred of N.C., Inc. v. Bond*, 160 N.C. App. 90, 100 (2003) (emphasis omitted).

156. This Court has explained that, unlike fraud claims, a claim for negligent misrepresentation must be based on an actual misrepresentation, not merely an omission or failure to disclose information:

[U]nder North Carolina law, a negligent misrepresentation claim cannot be based on an omission. *See Aldridge v. Metro. Life Ins. Co.*, 2019 NCBC LEXIS 116, at *112–13 (N.C. Super. Ct. Dec. 31, 2019) ("[A] claim for negligent misrepresentation can only be based on affirmative misrepresentations, not on omissions." (citing *Harrold v. Dowd*, 149 N.C. App. 777, 783, 561 S.E.2d 914, 919 (2002))).

*McGuire v. Lord Corp.*, 2020 NCBC LEXIS 15, at *13 (N.C. Super. Ct. Feb. 11, 2020).

157. Our Supreme Court has held that a claim for negligent misrepresentation (like a claim for fraudulent misrepresentation) "must satisfy the heightened pleading standard of North Carolina Rules of Civil Procedure Rule 9(b)." *Value Health Sols., Inc. v. Pharm. Rsch. Assocs.*, 385 N.C. 250, 265 (2023).

158. At the 21 January hearing, Plaintiffs clarified that this claim is based on paragraphs 22, 31, and 84 of the Amended Complaint, which read as follows:

As discussions related to the Confidential LOI evolved, the Kolatch Parties and BMB explored having a BMB affiliate purchase the Iron Horse Loan from SDCK so that the BMB affiliate could complete the Iron Horse Auction and acquire title to the Encumbered Parcel on the new Auction Date of July 30, 2022. Implicit in these discussions was the understanding that no money would actually change hands. SDCK would "sell" the Iron Horse Loan to BMB or its affiliate, and the purchase price would immediately be given back to BMB in exchange for an equity interest in the Encumbered Property up to the purchase

price.

. . .

[A]gents of the BMB Parties together with Mr. Kolatch met with the Mayor of "the Big Island," where the Hawaii Project was located, on numerous occasions, and would represent that they were all one and the same entity, SDCK, working to acquire the Hawaii Real Estate, including the Encumbered Parcel.

. . .

Defendants represented to Plaintiffs that they would work together to move the Hawaii Project forward and share in all profits and losses. These representations were made over the course of three years, from February 2022 to early 2025, as alleged herein.

(Am. Compl. ¶¶ 22, 31, 84.)

159. These allegations do not even come close to satisfying Rule 9(b)'s heightened pleading standard. Plaintiffs' allegations provide no particularity as to the time or place of the alleged misrepresentations and are largely silent on the specific misrepresentation allegedly made or the identity of the person or persons making them.

160. Accordingly, Defendants' Motions to Dismiss regarding Plaintiffs' misrepresentation and omission claim are **GRANTED**, and that claim is **DISMISSED** with prejudice.

### X. Civil Conspiracy and Aiding and Abetting

161. Plaintiffs' final claim is for civil conspiracy.[8]

162. Civil conspiracy requires "(1) an agreement between two or more

---

[8] Although the claim is labeled in the Amended Complaint as "Civil Conspiracy and Aiding and Abetting," Plaintiffs' counsel conceded at the 21 January hearing that the claim was simply one for civil conspiracy.

individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; and (3) resulting in injury to [the] plaintiff inflicted by one or more of the co-conspirators; and (4) pursuant to a common scheme." *Strickland v. Hedrick*, 194. N.C. App. 1, 19 (2008) (cleaned up). It is well established that

> [t]here is no independent cause of action for civil conspiracy. Only where there is an underlying claim for unlawful conduct can a plaintiff state a claim for civil conspiracy by also alleging the agreement of two or more parties to carry out the conduct and injury resulting from that agreement.

*Toomer v. Garrett*, 155 N.C. App. 462, 483 (2002) (cleaned up).

163. Plaintiffs' conspiracy claim hinges on the existence of the tort claims it has asserted in the Amended Complaint. However, because the Court has now dismissed all of those tort claims in this Opinion, there is no longer a predicate claim upon which the conspiracy claim can be based. *See Loray Master Tenant, LLC v. Foss N.C. Mill Credit 2014 Fund I, LLC*, 2021 NCBC LEXIS 15, at *24 (N.C. Super. Ct. Feb. 18, 2021) ("Because the Court has dismissed all underlying claims asserted against [defendant] by Plaintiffs, dismissal of Plaintiffs' conspiracy claim necessarily follows."); *Azure Dolphin, LLC v. Barton*, 2017 NCBC LEXIS 90, at *28–29 (N.C. Super. Ct. Oct. 2, 2017) ("Here, the conspiracy claim depends on the underlying 'fraud' claims, which the Court has dismissed. Therefore, Plaintiffs' conspiracy claim is likewise dismissed with prejudice." (cleaned up)).

164. Therefore, Defendants' Motions to Dismiss regarding Plaintiffs' civil conspiracy claim are **GRANTED**, and that claim is **DISMISSED** with prejudice.

## CONCLUSION

**THEREFORE**, the Court hereby **ORDERS** as follows:

a.      Defendants' Motions to Dismiss pursuant to Rule 12(b)(1) are **DENIED**.

b.      Defendants' Motions to Dismiss pursuant to Rule 12(b)(6) are **GRANTED in part** and **DENIED in part** as set out below:

    i.  Defendants' Motions to Dismiss Plaintiffs' claim for breach of contract is **DENIED** as to SDCK.[9]

    ii.  Defendants' Motions to Dismiss Plaintiffs' claim for breach of contract is **GRANTED** as to all other Defendants, and that claim is **DISMISSED** with prejudice as to those other Defendants.

    iii.  Defendants' Motions to Dismiss as to all other claims asserted by Plaintiffs are **GRANTED**, and those claims are **DISMISSED** with prejudice.

    **SO ORDERED**, this the 28th day of April 2026.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge for
Complex Business Cases

---

[9] Because DTLG is now the sole Plaintiff in this case and SDCK is the sole Defendant, the parties are directed to modify the caption in this case accordingly on all future filings.